IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 17-00393-01-CR-W-BCW |
| ) | |
| MAURICE FREEMAN, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Freeman's Motion to Suppress Evidence (doc #21). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On December 7, 2017, a criminal complaint was filed against defendant Maurice Freeman. On December 12, 2017, the grand jury returned a one-count indictment against defendant Freeman. The indictment charges that on or about December 6, 2017, defendant, having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm.

On March 27, 2018, an evidentiary hearing was held on defendant's motion to suppress. Defendant Freeman was represented by retained counsel, Matthew J. O'Connor and Keith N. Willison. The Government was represented by Assistant United States Attorney David Raskin. The Government called Sergeant Steve McClintick, Detective Blaine Seymour, and Detective Aaron King of the St. Joseph, Missouri Police Department and Captain Shawn Collie of the Buchanan County Sheriff's Office as witnesses. The defense called no witnesses to testify.

## II. FACTS

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On December 6, 2017, at approximately 10:00 a.m., Detective Blaine Seymour began conducting surveillance on 625 South 14th Street in St. Joseph, Missouri. (Tr. at 38-39) The purpose of the surveillance was to attempt to locate a subject by the name of Derrick Ashley, Jr. (Tr. at 38) Detective Seymour testified that Ashley, Jr. was a suspect in a shooting case. (Tr. at 38) Detective Seymour was not investigating that case; he was merely assisting in another detective's investigation. (Tr. at 38-39) When he initially arrived in the area, Detective Seymour observed a silver Pontiac four-door vehicle parked behind a tan Buick SUV. (Tr. at 42) Detective Seymour observed two middle-aged black males inside the Pontiac. (Tr. at 42) Approximately 30 to 45 minutes later, Detective Seymour observed Derrick Ashley, Jr. exit the target residence and appear to have a short conversation with the occupants of the Pontiac. (Tr. at 44) Detective Seymour advised his sergeant, as well as several other units who were monitoring the same radio frequency, that he had seen Ashley, Jr. (Tr. at 39-40) The information was used to obtain a search warrant for 625 South 14th Street. (Tr. at 40, 64-65; Government's Ex. 9)

2. Detective Seymour testified that as he continued his surveillance, he observed the Pontiac leave the area and a maroon Cadillac arrive at the scene. (Tr. at 45) Detective Seymour testified that Derrick Ashley, Sr., and Juanisha Ashley exited the Cadillac. (Tr. at 45-46) Ashley, Sr. stood on the sidewalk and Juanisha Ashley walked up towards the residence. (Tr. at 46) Shortly thereafter, the Pontiac returned and parked behind the Cadillac. (Tr. at 46) Detective Seymour then saw Derrick Ashley, Jr. exit the target residence again and walk down to the Pontiac. (Tr. at 47) Detective Seymour saw Ashley, Jr. remove a large bag of dog food from the vehicle and walk back up to the residence. (Tr. at 47) Detective Seymour testified that when the time came to execute the search warrant, he was to secure any people located in the vehicles in front of the residence. (Tr. at 48) Detective Seymour testified that as he was approaching the vehicles, there were Special Response Team operators walking that way as well. (Tr. at 48) As he approached the tan Buick, Detective Seymour testified that he began to smell a strong odor of fresh marijuana. (Tr. at 48-49) Detective Seymour testified that the odor of marijuana got stronger as he got closer to the Pontiac. (Tr. at 49) Detective Seymour testified that the Pontiac's sunroof was open. (Tr. at 49)

3. Sergeant Steve McClintick testified that he was involved in the execution of the search warrant at 625 South 14th Street. (Tr. at 5) Sergeant McClintick was a member of the Special Response Team, a team that serves high-risk warrants. (Tr.

2

at 3-4) Prior to the execution of the search warrant, officers were briefed regarding the circumstances of the warrant. (Tr. at 5) Detective Aaron King testified that he briefed the Special Response Team. (Tr. at 65) Sergeant McClintick testified that the officers were told that the main subject they were looking for was Derrick Ashley, Jr., the subject of a couple different open case investigations, which included a street level robbery, a bank robbery, and a shooting incident. (Tr. at 5-6) Ashley, Jr. was known to be armed with firearms at the time he was involved in the bank robbery. (Tr. at 6) Detective King testified that he believed there would be guns within the residence. (Tr. at 65) There was also a high potential for other subjects, including a second suspect in the bank robbery, to be present at the house to be searched. (Tr. at 6)

4. Sergeant McClintick testified that six or seven Special Response Team officers rode to the address to be searched in a police armored vehicle. (Tr. at 6-7) The officers were wearing green uniforms with black tactical vests that have police patches on the front and the back. (Tr. at 10-11) Various detectives who were conducting surveillance on the residence were giving live updates as the officers were approaching the residence. (Tr. at 7) The officers were advised that there was a tan Buick SUV parked directly in front of the house, which was owned by one of the primary residents. (Tr. at 7) A red Cadillac Escalade SUV, which was used by Derrick Ashley, Sr., was parked behind the Buick. (Tr. at 7) While they were en route, the main suspect, Ashley, Jr., was seen coming out onto the front porch. (Tr. at 7) A few minutes later, a silver Pontiac four-door was observed pulling up and parking behind the red Cadillac SUV. (Tr. at 7) Ashley, Jr. was observed walking out and meeting with the occupants of that car and then returning to the house. (Tr. at 7) Sergeant McClintick testified that "[o]nce we were advised that the main suspect went out and made contact with the occupants of that car that now, for SRT [Special Response Team] purposes, added them to the equation of the problem that we were going there for." (Tr. at 36)

5. When the officers in the armored vehicle arrived at the residence, Sergeant McClintick and two other team members branched off and went up 14th Street, clearing each car (the tan Buick SUV, the red Cadillac Escalade SUV, and the silver Pontiac four-door) to identify, locate and detain anybody in those vehicles. (Tr. at 8) Other team members established a perimeter on the outside of the residence. (Tr. at 9) Sergeant McClintick testified that anytime persons are located outside the residence to be searched, they are detained for officer safety. (Tr. at 8-9) A secondary reason for detaining persons outside the residence is to identify them and determine whether they are third parties to the investigation for whom the detectives might be looking. (Tr. at 9) Sergeant McClintick testified that as he moved past the tan Buick SUV and the red Cadillac Escalade SUV, he saw that each of these vehicles was unoccupied. (Tr. at 9)

3

6. Sergeant McClintick testified that when he was about going past the Cadillac, he could see two black males sitting in the front seats of the Pontiac. (Tr. at 9) By the time he got to the back of the Cadillac, Sergeant McClintick testified that he could smell marijuana. (Tr. at 9) At that same time, Sergeant McClintick could clearly see the two males in the Pontiac from their chests up. (Tr. at 9-10) The male in the passenger's seat was laid back in the seat looking down the sidewalk at the Special Response Team members who were approaching the house. (Tr. at 10) The driver was leaned forward with his hands down towards the floorboard while also looking down the sidewalk at the team members. (Tr. at 10-11) Sergeant McClintick testified that he assumed the driver was either retrieving something or concealing something under the seat. (Tr. at 11) Sergeant McClintick started addressing the subjects in the Pontiac, repeating that he was the police and that they needed to shut off the car and get their hands up. (Tr. at 10) Sergeant McClintick testified that the subjects in the Pontiac could hear him because the sunroof on the car was open. (Tr. at 10) The passenger turned and looked at Sergeant McClintick, sat up in his seat, and put his hands up on the windshield. (Tr. at 10) The driver then looked over at Sergeant McClintick, shut the car off, and put his hands up on the windshield. (Tr. at 10) Sergeant McClintick testified that the smell of marijuana was stronger as he approached the Pontiac, clearly coming out of the car through the sunroof. (Tr. at 11-12)

7. Sergeant McClintick opened the passenger's door of the Pontiac and directed the passenger, who turned out to be Derrick Ashley, Sr., out of the car. (Tr. at 12) Officers on the driver's side of the Pontiac were directing the driver, who turned out to be Maurice Freeman, out of the car. (Tr. at 12) Detective Seymour testified that as he got to the Pontiac, there were three or four Special Response Team operators around the Pontiac. (Tr. at 49) One of them opened the driver's door and Detective Seymour reached in, placed a hand on Freeman's wrist, and placed him in handcuffs. (Tr. at 49) Detective Seymour testified that when the car door was opened, the odor of marijuana continued to get stronger. (Tr. at 49) Sergeant McClintick testified that he recognized both the driver and passenger from previous dealings, but he could not recall their names. (Tr. at 12, 35) As he approached the Pontiac, Sergeant McClintick had no idea that Freeman was in the driver's seat. (Tr. at 34) Sergeant McClintick testified that Ashley, Sr., and Freeman were handcuffed, taken to the back of the police armored vehicle, and handed over to the detectives. (Tr. at 12-13) Sergeant McClintick assisted with the execution of the search warrant and had no other dealings with either Ashley, Sr., or Freeman. (Tr. at 13)

8. When Detective King arrived at the scene, Derrick Ashley, Sr., Derrick Ashley, Jr., and defendant Freeman were in custody at the back of the police armored vehicle. (Tr. at 67) Sergeant McClintick walked up to Detective King and advised that when they took Freeman and Ashley, Sr. out of the Pontiac, they could smell marijuana coming from the vehicle. (Tr. at 68) Sergeant McClintick directed

4

Case 4:17-cr-00393-BCW   Document 36   Filed 06/14/18   Page 4 of 12

Detective King to search the Pontiac. (Tr. at 67-68) Detective King testified that he could smell marijuana as he walked up to the driver's door of the Pontiac. (Tr. at 68) Detective King testified that the doors of the Pontiac were shut, but the sunroof was open. (Tr. at 68) When he opened the driver's door, Detective King testified that the marijuana smell was stronger. (Tr. at 68) Detective King opened the center console and observed a pill bottle. (Tr. at 68) Detective King opened the pill bottle and found that it contained a small amount of brown twine and a small, clear plastic bag of marijuana. (Tr. at 68-69) Detective King looked under the driver's seat and observed the handle of a pistol with the barrel pointing to the back of the vehicle. (Tr. at 69) Detective King pulled the pistol out, dropped the magazine, and cleared a live round from the chamber. (Tr. at 69)

9. Captain Shawn Collie is assigned as a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives. (Tr. at 76) Captain Collie received a call that a search warrant was being served. (Tr. at 77) When Captain Collie arrived at the scene, defendant Freeman and Derrick Ashley, Jr. were the only two people still in custody at the back of the police armored vehicle. (Tr. at 77) Captain Collie was advised that a firearm and marijuana had been located in Freeman's vehicle. (Tr. at 77) Captain Collie knew Freeman had a prior federal conviction. (Tr. at 78) Prior to seeing Freeman in custody at the back of the police armored vehicle, Captain Collie did not know that Freeman was involved in the events of the day. (Tr. at 79)

10. Detective Seymour testified that he stayed at the police armored vehicle with defendant Freeman while the Special Response Team operators secured the residence. (Tr. at 50) After the residence was secured, Freeman was escorted to a marked patrol vehicle where a patrol officer took him to booking. (Tr. at 50) Captain Collie advised the officers transporting Freeman that he had information that Freeman had previously used a jockstrap-type device to conceal narcotics on his person and that they would want to do a good search of his person at the jail. (Tr. at 79) Officers later advised that they had located a jockstrap-type device containing methamphetamine on Freeman's person. (Tr. at 79)

11. Captain Collie instructed officers to have the Pontiac towed to the Buchanan County Drug Strike Force garage. (Tr. at 80) Captain Collie photographed the Pontiac at the garage. (Tr. at 80-81; Government's Exs. 5, 6, 7) Captain Collie testified that all the windows of the Pontiac were up and the sunroof was open. (Tr. at 81) Captain Collie testified that he could smell the odor of marijuana getting stronger and stronger inside the garage. (Tr. at 81) Later that day, Captain Collie received a telephone call from Sergeant Larry Stobbs of the St. Joseph, Missouri Police Department. (Tr. at 81) Sergeant Stobbs had stopped by to get a trailer out of the garage. (Tr. at 81) Sergeant Stobbs had no involvement in the events earlier that day at 625 South 14th Street. (Tr. at 82) Sergeant Stobbs called Captain Collie to see if there had been a large seizure of marijuana that he

needed to be concerned about. (Tr. at 81-82) Sergeant Stobbs told Captain Collie that there was a strong odor of marijuana in the garage. (Tr. at 82)

III. DISCUSSION

Defendant seeks to suppress "all evidence and testimony obtained during the investigation and arrest of Mr. Freeman on December 6, [2017]," on the basis that the "evidence and statements were obtained without a warrant, probable cause or reasonable suspicion of criminal activity." (Motion to Suppress Evidence (doc #21) at 1) Specifically, defendant argues that the police had no reasonable suspicion to detain him just because he was parked up the street from a house for which the police were executing a search warrant. (Id. at 3-4) According to defendant, because the police violated the Fourth Amendment when they seized his person and searched his vehicle, all physical evidence and defendant's statements must be suppressed as fruit of the poisonous tree. (Id. at 5)

  A. Seizure of Defendant

Defendant argues that the police had no reasonable suspicion to detain him just because he was parked up the street from a house for which the police were executing a search warrant. Contrary to defendant's argument, the Court finds that the police officers arriving to execute the warrant to search the house at 625 South 14th Street had valid reasons to detain the occupants of the silver Pontiac.

The record in this case establishes that on December 6, 2017, officers were executing a high-risk search warrant at 625 South 14th Street in St. Joseph, Missouri. (Fact No. 3) The main subject the officers were looking for was Derrick Ashley, Jr., the subject of various open case investigations, which included a street level robbery, a bank robbery, and a shooting incident. (Id.) Ashley, Jr. was known to be armed with firearms at the time he was involved in

6

the bank robbery. (Id.) The officers believed there would be guns within the residence. (Id.) There was also a high potential for other subjects, including a second suspect in the bank robbery, to be present at the house to be searched. (Id.) Surveillance confirmed that Ashley, Jr. was present at the target residence and also that he had twice walked down to a silver Pontiac parked in front of the residence and had contact with the occupants of the vehicle. (Fact Nos. 1 and 2) As officers approached the Pontiac, they noticed a strong odor of marijuana coming from the vehicle. (Fact Nos. 2 and 6) While the occupants of the Pontiac (defendant Freeman and Derrick Ashley, Sr.) were looking down the sidewalk at the Special Response Team members who were approaching the house, Sergeant McClintick saw that the driver (defendant Freeman) was leaned forward with his hands down towards the floorboard. (Fact No. 6) Sergeant McClintick assumed the driver was either retrieving something or concealing something under the seat. (Id.) Freeman and Ashley, Sr. were ordered out of the vehicle and placed in handcuffs. (Fact No. 7)

As set forth in United States v. Martinez-Cortes, 566 F.3d 767, 770 (8th Cir. 2009), the protection of officers is a valid justification for detaining individuals in vehicles outside premises to be searched. In Martinez-Cortes, officers stopped a vehicle backing down the driveway of the target residence. Id. at 769. The court found:

> [S]topping the [vehicle] was justified by the strong interest in protecting the safety of officers engaged in the inherently dangerous activity of executing a warrant to search for narcotics. See [L.A. County v. Rettele, 550 U.S. 609, 614 (2007); Michigan v. Summers, 452 U.S. 692, 702 (1981)]. The officers had sufficient evidence that firearms were on the premises to convince a magistrate to issue a no-knock warrant. It was dark outside, and a vehicle previously seen at the residence was backing down the driveway as the officers approached. The [vehicle] was close enough to the residence that "an armed individual inside could pose a danger to officers on the scene." United States v. Jones, 471 F.3d 868, 875 (8th Cir. 2006), cert. denied, 551 U.S. 1121 (2007); see Maryland v. Buie, 494 U.S. 325, 333 (1990). Moreover, had the officers allowed the [vehicle] to drive away, they faced the risk that its occupants would use a cell phone to warn those in the house of the imminent search, thereby undermining the protections of a

7

> no-knock entry. "The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." Summers, 452 U.S. at 702-03.
>
> These inherent risks to officer safety were magnified when the occupants of the [vehicle] did not promptly comply with orders to put the vehicle in park and show their hands, and Martinez-Cortes moved his arms as if to hide something between his leg and the car's console. These furtive actions gave the officers reason to suspect … that the occupants might be a risk to officer safety unless detained while the warrant search was completed. This justified the officers' decisions to order Martinez-Cortes out of the [vehicle], see United States v. Stachowiak, 521 F.3d 852 (8th Cir. 2008); ... [and] to handcuff him, see United States v. Walker, 555 F.3d 716, 721 (8th Cir. 2009) ….

Martinez-Cortes, 566 F.3d at 770-71. In the instant case, the main subject of the investigation, Derrick Ashley, Jr., had twice walked down to the silver Pontiac parked in front of the residence and had contact with the occupants of the vehicle. Thus, the silver Pontiac and its occupants had ties to Ashley, Jr. and the residence at 625 South 14th Street. As in Martinez-Cortes, the officers in the instant case were engaged in executing a search warrant for a residence believed to contain firearms, the silver Pontiac was close enough to the residence that an armed individual inside could pose a danger to officers on the scene, the driver of the vehicle (defendant Freeman) leaned forward with his hands down towards the floorboard as if to hide something, and there was the risk that the occupants of the vehicle would use a cell phone to warn those in the house of the imminent search, thereby putting officers at risk. This Court agrees that "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." Martinez-Cortes, 566 F.3d at 771. Thus, the initial seizure of defendant Freeman was justified for safety reasons.

In addition, the Court finds that as officers approached the silver Pontiac, they were presented with sufficient facts to justify an investigative stop. In determining whether an officer had reasonable suspicion to conduct an investigative stop, the court must look at the

totality of the circumstances to see whether the detaining officer had a particularized and objective basis for suspecting legal wrongdoing.  See United States v. Montgomery, 828 F.3d 741, 743-44 (8th Cir. 2016).   Here, as officers approached the Pontiac, they noticed a strong odor of marijuana coming from the vehicle.  While the occupants of the Pontiac (defendant Freeman and Derrick Ashley, Sr.) were looking down the sidewalk at the Special Response Team members who were approaching the house, Sergeant McClintick saw that the driver (defendant Freeman) was leaned forward with his hands down towards the floorboard.  Sergeant McClintick assumed the driver was either retrieving something or concealing something under the seat.  The Court finds that the officers had a particularized and objective basis for suspecting legal wrongdoing which provided a sufficient basis for seizing defendant Freeman.

"[A] police officer may take steps reasonably necessary to protect his or her personal safety and the safety of others and to maintain the status quo of a situation while verifying or dispelling suspicion in a short period of time."  United States v. Seelye, 815 F.2d 48, 50 (8th Cir. 1987)(citing United States v. Jones, 759 F.2d 633, 636-37 (8th Cir.), cert. denied, 474 U.S. 837 (1985)).  Protective measures allow for the use of handcuffs.  See United States v. Morgan, 729 F.3d 1086, 1091 (8th Cir. 2013)("[p]olice officers reasonably may handcuff a suspect during the course of a *Terry* stop to protect their personal safety"); United States v. Walker, 555 F.3d 716, 721 (8th Cir. 2009).  The Court finds that the officers' actions in handcuffing defendant Freeman were reasonably necessary to protect the officers' personal safety and to maintain the status quo so that the officers could determine whether defendant was engaged in criminal activity.   No constitutional violation took place.

B.  <u>Warrantless Search</u>

In <u>Arizona v. Gant</u>, 556 U.S. 332 (2009), the United States Supreme Court provided the following basic guidance when analyzing a warrantless search of a vehicle:

> Consistent with our precedent, our analysis begins, as it should in every case addressing the reasonableness of a warrantless search, with the basic rule that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions." <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967)(footnote omitted).

<u>Gant</u>, 556 U.S. at 338. One of the established exceptions to the warrant requirement that the Court listed was the "automobile exception." The Court stated:

> Other established exceptions to the warrant requirement authorize a vehicle search under additional circumstances when safety or evidentiary concerns demand. ... If there is probable cause to believe a vehicle contains evidence of criminal activity, <u>United States v. Ross</u>, 456 U.S. 798, 820-21 (1982), authorizes a search of any area of the vehicle in which the evidence might be found. ... <u>Ross</u> allows searches for evidence relevant to offenses other than the offense of arrest, and the scope of the search authorized is broader.

<u>Gant</u>, 556 U.S. at 346-47. <u>See</u> <u>also</u> <u>United States v. Vore</u>, 743 F.3d 1175, 1179 (8th Cir. 2014) (automobile exception permits warrantless search of vehicle if police had probable cause to believe vehicle contained contraband before search began). "Probable cause exists 'where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" <u>United States v. Cortez-Palomino</u>, 438 F.3d 910, 913 (8th Cir. 2006)(quoting <u>United States v. Kennedy</u>, 427 F.3d 1136, 1141 (8th Cir. 2005)).

As set forth above, as officers approached the silver Pontiac, they noticed a strong odor of marijuana coming from the vehicle. (Fact Nos. 2 and 6) Detective King, who was not present when the officers originally approached the Pontiac, was advised by Sergeant McClintick that when the officers took defendant Freeman and Ashley, Sr. out of the Pontiac, they could smell

10

Case 4:17-cr-00393-BCW   Document 36   Filed 06/14/18   Page 10 of 12

marijuana coming from the vehicle. (Fact No. 8) Sergeant McClintick then directed Detective King to search the Pontiac. (Id.) Detective King testified that he could smell marijuana through the open sunroof as he walked up to the driver's door of the Pontiac. (Id.) Detective King found a small, clear plastic bag of marijuana in the center console and a loaded pistol under the driver's seat. (Id.)

The Court finds that the observations of the officers created a fair probability that marijuana would be found inside the vehicle. See United States v. Walker, 840 F.3d 477, 483-84 (8th Cir. 2016)(odor of unburned marijuana provided probable cause to search car); United States v. Winters, 221 F.3d 1039, 1042 (8th Cir. 2000)(probable cause to search vehicle and its containers for drugs existed when officer smelled raw marijuana inside vehicle). Thus, pursuant to the automobile exception, Detective King was authorized to conduct a warrantless search of the vehicle. No constitutional violation took place.

C. Fruit of the Poisonous Tree

Finally, defendant argues that because the police violated the Fourth Amendment when they seized his person and searched his vehicle, all physical evidence and defendant's statements must be suppressed as fruit of the poisonous tree. Under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of physical evidence and verbal evidence obtained directly or indirectly through the exploitation of police illegality. See Wong Sun v. United States, 371 U.S. 471, 484-88 (1963). As set forth above, the Court finds that the seizure of defendant and the search of his vehicle were lawful. Therefore, defendant's fruit of the poisonous tree argument must also fail.

11

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Freeman's Motion to Suppress Evidence (doc #21).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                                     */s/ Sarah W. Hays*
                                                                          SARAH W. HAYS
                                      UNITED STATES MAGISTRATE JUDGE